IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MISSION 1ST GROUP, INC.,
      Plaintiff,

      v.                                    Civil No. 1:23cv1682 (DJN)

MISSION FIRST SOLUTIONS, LLC,
      Defendant.

## MEMORANDUM ORDER
### (Granting Plaintiff's *Daubert* Motion and Denying Defendant's *Daubert* Motion)

This matter comes before the Court on the parties' *Daubert* motions: (1) Plaintiff Mission1st Group, Inc.'s ("M1G") Motion to Exclude the Testimony of Defendant's Expert Kevin W. Christensen ("Christensen Motion") (ECF No. 35); and (2) Defendant Mission First Solutions, LLC's ("MFS") Motion to Exclude the Testimony of Plaintiff's Expert Gregory J. Urbanchuk ("Urbanchuk Motion") (ECF No. 33). These motions have been fully briefed, (ECF Nos. 34, 36, 41, 42, 53, 58), rendering them ripe for resolution. For the reasons set forth below, the Court hereby GRANTS IN PART and DENIES IN PART the Christensen Motion (ECF No. 35) and DENIES the Urbanchuk Motion (ECF No. 33).

## I.    BACKGROUND

Plaintiff M1G owns the federally registered trademark MISSION1st in connection with business advisory, information, technology, telecommunications, engineering support and risk mitigation services. (ECF No. 1 ("Complaint") ¶ 1.) Plaintiff provides these services to a variety of entities, including serving as a government contractor to various government agencies. (*Id.* at ¶¶ 4, 22.) It began using its trademark in commerce as early as January 1, 2006, and

obtained a federal registration for the MISSION1ST mark on October 18, 2011.  (ECF Nos. 36 at

2, 1 ¶ 16.)  It also operates a website where it advertises its services at www.mission1st.com.

(ECF No. 1 ¶ 14.)

Plaintiff alleges that Defendant MFS, established in 2016, has infringed upon its

trademark, violated statutory and common law prohibitions on unfair competition and committed

cybersquatting.  Specifically, Plaintiff alleges that Defendant adopted a Mark confusingly similar

to its own and subsequently used that mark to distribute, market, advertise, promote, and sell

identical services as Plaintiff to U.S. military components and contractors.  (*Id.* ¶¶ 1, 25.)

Plaintiff also alleges that Defendant obtained the domain www.mission1s.com, which is almost

identical to Plaintiff's domain name, and that Defendant uses this domain to host its website,

where it advertises and promotes its services.  (*Id.* ¶¶ 27, 29.)  Plaintiff alleges that this behavior

continued despite Plaintiff having sent a cease-and-desist letter to Defendant in December 2022.

(*Id.* ¶ 33.)  According to Plaintiff, Defendant's actions have created confusion among existing

and potential clients, and Plaintiff submits that these actions have caused, and continue to cause,

damage and immediate irreparable harm to M1G and its reputation and goodwill with potential

clients.  (*Id.* ¶ 38.)

Defendant denies Plaintiff's allegations of infringement, unfair competition, and

cybersquatting.  (ECF No. 10 ¶¶ 39–73.)  In its Answer, Defendant raises several

counterarguments, styled as affirmative defenses, including its claims that Plaintiff's complaint

fails due to lack of a valid trademark, lack of likelihood of confusion, lack of unauthorized use,

the doctrine of unclean hands, lack of infringement, estoppel, lack of damages and fraud.  (*Id.*

¶¶ 74–81.)  In addition, Defendant filed a counterclaim for a declaration of non-infringement,

arguing that its mark is not confusingly similar or dilutive of Plaintiff's mark and does not

2

otherwise infringe upon it, and for trademark cancellation on the ground of fraud, based on Plaintiff's allegedly fraudulent renewal filing with the United States Patent and Trademark Office (USPTO) in 2021. (*Id.* at 11–15.)

In the course of this litigation, Plaintiff retained Gregory J. Urbanchuk, a forensic, dispute and valuation consultant, as an expert in this matter. (ECF No. 34-2 at 5.) Plaintiff tasked Mr. Urbanchuk with quantifying the monetary harm to Plaintiff that resulted from MFS's alleged infringement. (*Id.*) Defendant subsequently retained economist Kevin W. Christensen as an expert. (ECF No. 36-1 at 5.) Mr. Christensen's report sets out to quantify Plaintiff's damages and review and assess Mr. Urbanchuk's damages calculations. (*Id.*) Each party now seeks to exclude the opposing expert's testimony. (ECF Nos. 33, 35.)

## II.      LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if" all the following conditions are satisfied:

> (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

3

Rule 702 thus establishes "a district court's gatekeeping responsibility to 'ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). In undertaking this gatekeeping function, district courts enjoy "broad latitude" to consider "the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). The Rule 702 inquiry thus necessarily proves "flexible," focusing on the expert's "principles and methodology" rather than the conclusions that the expert draws. *Id.*

"A reliable expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Courts look to several factors as indicia of reliability, including "testing, peer review, evaluation of rates of error, and general acceptability" in the expert's field. *Id.* For an expert to satisfy a court's reliability inquiry, that court must find that "the reasoning or methodology underlying the [proffered] testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–593.

Regarding relevance, the Court must ask "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. The relevance inquiry is one of "fit" — expert testimony must demonstrate "a valid . . . connection to the pertinent inquiry as a precondition" of admissibility. *Id.* at 592.

Throughout its Rule 702 analysis, a district court must remain cognizant of two bedrock, yet competing, principles. On the one hand, Rule 702 "was intended to liberalize the introduction of relevant expert evidence." *Westberry*, 178 F.3d at 261. District courts therefore

4

"need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Id.* On the other hand, expert testimony often proves uniquely capable of confusing or misleading the jury. *Id.* "Proffered evidence that has a greater potential to mislead than to enlighten" should therefore be excluded. *Id.* Critically, the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Fed. R. Evid. 702; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

Trial courts enjoy broad discretion when ruling on *Daubert* motions. *See United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir.1995) ("[A] trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony.") In many instances, vigorous cross-examination at trial serves as the more suitable remedy for a party seeking to exclude the opposing expert's testimony. *See* Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.") (quoting *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996)); *Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## III.     DISCUSSION

### A.     Christensen Motion

Defendant retained Mr. Christensen to quantify damages pursuant to Plaintiff's allegations and to "review and assess the quantum of damages calculation" by Plaintiff's proposed expert Gregory Urbanchuk. (ECF No. 36-1 at 5–6.) In his report, Christensen cites his 20 years of experience providing "economic and data analysis consulting services," prior

submissions of expert reports (including to this Court) and his academic training in economics as a basis for his qualification to serve as an expert in this matter. (*Id.* at 4.)  While Christensen cites prior experience with matters involving "antitrust & competition, public policy, . . . damages analysis" and "competition economics," as well as some academic and teaching work focused on innovation and patents, he does not cite any prior experience in the economics or law of trademark infringement, nor any prior experience performing damages analyses in trademark litigation. (*Id.; see* ECF No. 36-2 at 62:3-5 ("I do not recall any instances where I performed – where in trademark litigation I performed a damages analysis").)  While there exists some disagreement between the parties as to his experience specifically concerning government contracts, it appears that this experience is limited, if not negligible. (ECF No. 36-1 at 4; *see, e.g.,* ECF No. 36-2 at 118:4–6 ("[T]his is the first time I've testified on government [contracting] – on this particular industry").)

Christensen's report includes opinions on several matters.  First, he opines, based on his analyses, that Plaintiff and Defendant "operate in different segments of the government contracting industry," and that there exists limited overlap in their areas of competition. (ECF No. 36-1 at 6–7.)  He also opines that, "[a]s a matter of economics", trademarks have limited utility in the government contract industry. (*Id.* at 7.)  With regard to Plaintiff's expert Mr. Urbanchuk's calculations, Mr. Christensen alleges several methodological errors, including that Mr. Urbanchuk's analysis "disregards salient facts," includes profits earned by Defendant that Plaintiff could not have earned (for lack of either eligibility or actual competition in certain areas) and includes potential double counting. (*Id.*)  Finally, in the section concerning Mr. Urbanchuk's report, Mr. Christensen opines on Plaintiff's damages.  There, he states that, based on his opinions concerning the "limited evidence" of competition between Plaintiff and

6

Defendant, and based on his opinion that "the effect of a mark in the government contracting industry . . . does not provide the customer with the same benefit" as in other industries, "*none* of the revenues and profits earned by MFS are the result of the alleged infringement." (*Id.* at 23 (emphasis added).) He later clarified, in his deposition, that this statement serves to convey "the opinion that damages are zero." (ECF No. 36-2 at 137:17–138:3.)

Plaintiff challenges the admissibility of Christensen's prospective testimony on three bases. It alleges that his report was submitted in an untimely fashion; that he lacks the necessary qualifications to opine on the damages in trademark litigation where the value of trademarks in the government contract industry is at issue; and that his methodology for calculating quantum of damages is unreliable, therefore rendering his testimony insufficiently reliable under *Daubert* and its progeny. (ECF No. 36 at 8–20.)

For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion to Exclude. The Court denies Plaintiff's motion as to untimeliness, but grants Plaintiff's motion as to Mr. Christensen's lack of qualification to opine on the valuation of trademarks in the government contract industry and his insufficiently reliable methodology. Consequently, Defendant's expert may testify only as to his opinions on whether, and to what extent, Plaintiff and Defendant compete with each other, and his opinions concerning Plaintiff's expert's methodology.

### 1.    Court's Analysis

For the purposes of its analysis, and after extensive study of his report and deposition, the Court considers Mr. Christensen's proposed testimony to consist of essentially four sets of opinions: (1) his opinions concerning whether, and to what extent, Plaintiff and Defendant compete with each other; (2) his opinions concerning the value of trademarks to government

7

contractors; (3) his opinions concerning what, if any, damages Plaintiff is entitled to receive if Defendant is found liable; and (4) his opinions concerning Mr. Urbanchuk's methodology. Since Plaintiff challenges Mr. Christensen's opinions on diverse grounds, this general delineation will help keep the Court's analysis clear.

The Court proceeds to tackle each of Plaintiff's grounds for exclusion in turn.

### a.     Reliability of Methodology for Calculating Quantum of Damages

The Court begins by considering Plaintiff's challenge to the reliability of Mr. Christensen's methodology as to quantum of damages. Plaintiff submits that Mr. Christensen does not employ "any methodology or mathematical calculation" in arriving at his opinion that Plaintiff is entitled to zero damages. (ECF No. 36 at 5.) In support, Plaintiff points to the fact that the report "does not set forth any methodology and does not include any calculations." (*Id.* at 15.) Plaintiff further submits that, when pressed on this point during his deposition, Christensen "simply chang[ed] his methodology and calculation." (*Id.* at 17.) This "vagueness" and "inconsistency" in Christensen's methodology, paired with what Plaintiff alleges constitute "asserted, but not proven, premises" regarding other aspects of the underlying dispute, render Christensen's opinion on quantum of damages unreliable, requiring exclusion of his testimony under *Daubert*. (*Id.* at 18, 20.)

In response, Defendant submits that Christensen used "sound" methodology and proceeds to describe the steps of Mr. Christensen's inquiry. (ECF No. 41 at 8.) First, Defendant restates Mr. Christensen's opinions concerning the limited degree of competition between Plaintiff and Defendant and the purportedly reduced value of trademarks in the government contracting context. Defendant then proceeds to assert that Mr. Christensen "concluded" "[f]rom there" that "none of Defendant's profits were attributable to alleged trademark infringement." (*Id.* at 9.)

8

According to Defendant, a lack of mathematical calculations does not render Mr. Christensen's methodology unsound, because "no arithmetic was (or is) necessary" here. (*Id.*)  Without elaborating further on Mr. Christensen's methodology, Defendant concludes by reiterating that the methodology is "sound," and that, "accordingly," Mr. Christensen is "more than qualified" to submit testimony as to damages in this case. (*Id.*)

Having studied Mr. Christensen's report, this Court remains utterly baffled by his opinion concerning the quantum of damages.  As a threshold matter, the Court struggles to understand why Mr. Christensen's only statement concerning Plaintiff's potential damages comes at the very end of his report, buried in a section rebutting Plaintiff's proposed expert's methodology, when Defendant ostensibly retained him to serve as an expert on the quantum of damages.  This statement — that "none of the revenues and profits earned by MFS are the result of the alleged infringement" — hardly serves as a model of clarity.  (ECF No. 36-1 at 22.)  Mr. Christensen's statement leaves out the critical inference that he presumably expects his readers to make (and on which he was hired to opine):  a lack of revenues and profits equals a lack of *damages*.  Finally, by failing to describe his methodology at any point in his report and by providing no description of how he approaches the quantum of damages analysis, what methods that he employs and what economic principles that he relies upon, Mr. Christensen made this Court's task of assessing his methodology considerably more difficult.  Nonetheless, based on the breadcrumbs contained in his report and, more illuminatingly, the clarifications made in response to Plaintiff's questioning during a five-hour deposition, the Court painstakingly assembles what it believes to be an accurate representation of Mr. Christensen's approach to calculating quantum of damages. Having done so, the Court then proceeds to analyze whether Mr. Christensen's methodology (to

9

the extent one emerges) proves sufficiently reliable to pass muster under *Daubert*. The Court

ultimately finds that it does not.

In his report, Mr. Christensen begins by assessing the degree to which Plaintiff and

Defendant compete in the marketplace.[1] (ECF No. 36-2 at 6.)  In relevant part, Mr. Christensen

formulates the opinions that (1) there exists "limited overlap" in the industry segments served by

each company and their customer base; (2) that each company lacks eligibility for some of the

contracts pursued and received by the other company; and (3) that there are "substantial

differences" in the size of contracts awarded to each company. (*Id.* at 6.)  He also points out that,

per the information that he reviewed, there exist no documented instances where Plaintiff lost a

contract to Defendant, and only one documented instance where the two competed head to head.

(*Id.* at 7.)  Next, Mr. Christensen formulates the opinion that trademarks possess "limit[ed] . . .

utility" to government contractors and do not provide contractors "with the same benefit as

would be true in other industries." (*Id.* at 7, 22.)  He does not present an analysis or formulate an

opinion on the quantum of damages in any of the first four sections of his report, including in his

"Summary of Opinions." (*Id.* at 6–7.)

The closest that Mr. Christensen comes to providing an analysis for quantum of damages

is in the report's final section, "Plaintiff's Damages Analysis." (*Id.* at 22.)  Here, while rebutting

Plaintiff's proposed expert's analysis, Christensen reinvokes his earlier opinions concerning the

"limited evidence" of competition between Plaintiff and Defendant and the reduced benefit of

---

[1]     The Court focuses here exclusively on Mr. Christensen's methodology in arriving at his
opinion on the quantum of damages, not his methodologies in arriving at his underlying opinions
concerning the degree of competition between the parties and the relative value of trademarks in
the government contracting context discussed here.  For the purposes of its present analysis only,
the Court accepts these underlying opinions as reliable.  Plaintiff challenges these underlying
opinions on other grounds, which the Court assesses to the extent necessary below.

trademarks in the context of government contracting before proceeding to his singular statement concerning quantum of damages: "Collectively, this means none of the revenues and profits earned by MFS are the result of the alleged infringement." (*Id.*) As the Court already lamented above, Mr. Christensen never expressly states the inference that zero revenues and profits resulting from infringement equals zero damages to the trademark holder. Nonetheless, the Court reads this inference into the report for the purposes of this analysis. On that basis, the Court understands Mr. Christensen to opine that Plaintiff's quantum of damages equals zero.[2] Significantly, Mr. Christensen does not elaborate further as to why his earlier opinions "[c]ollectively ... mean[]" zero revenues and profits as a result of Defendant's alleged infringement, or what methodology he used to arrive at this opinion.

In his October 3, 2024 deposition, Mr. Christensen clarified some aspects of his approach, specifically as to how he proceeded from his opinions about competition and trademark value to his opinion on damages. As a threshold matter, Christensen clarified that his methodology starts with applying "insights from information economics . . . to this industry to understand how it works better." (ECF No. 36-2 at 112:7–12.) According to his testimony, "as an economist, I have to think about the body of the evidence, not just one piece . . . to draw an economic conclusion." (*Id.* at 142:15–18.) In applying this methodology to the assignment of quantifying damages, Christensen explains that "[a] predecessor of that is to understand the economics of the industry. And so I undertook the investigation of the economics of the industry to identify [the relevance of existing contracts and the value of the trademark] . . . and I reached the conclusion that there was nothing left to add." (*Id.* at 149:2–9.) As to how he progressed

---

[2]    Mr. Christensen confirmed during his deposition that this inference is, indeed, the one that he intended for readers to make. (*See* ECF No. 36-2 at 113:19–114:10 (clarifying that this statement is the only damages figure in his report).)

from his opinions on competition and trademark value to his opinion of zero damages,
Christensen stated the following in his deposition:

> "[T]he notion that these two entities . . . without overlapping competitors [sic].
> Without overlapping expertise, in an industry which places little value on
> trademarks themselves, I don't need to add zero plus zero plus zero equals zero.
> It's – it's – that's not a mathematical equation that I need to put in to offer the
> opinions that damages are zero."

(*Id.* at 137:17–138:3.)

At a later point in his deposition, Christensen suggested a different methodology
that is based on multiplication, rather than addition:

> "It's – I mean – zero times one is zero.  Zero times infinity is zero.  So it's –
> again, once I am able to determine that there is not a lot of competition, overlap,
> opportunities for there to be – and once I see there's not a lot of confusion pointed
> to by the plaintiff, and when I realize that there's not a lot of opportunity for the
> plaintiff to work on the contacts the defendant won and vice versa, there are no
> contracts left on which to multiply a valuation to."

(*Id.* at 164:12–22.)

Christensen also emphasized the malleability of his methodology based on the facts
available: "if there are new facts that come to light, then that's going to change the
methodology." (*Id.* at 151:10–11.)  Finally, the Court notes that, in the course of his testimony,
Mr. Christensen never asserted that Plaintiff and Defendant were *not* competitors or that
Plaintiff's trademark possessed *no* value. (*See id.* at 159:19–20 (stating that "it is possible for
there to be some value" in Plaintiff's trademark); 161:17–18 ("they may have some value").)

Based on his report and the transcript of his testimony, the Court interprets Mr. Christensen to be saying that his methodology in assessing damages consists of the following components. First, he assesses certain economic factors concerning both the relevant parties (specifically regarding their business strategy and approach) and the relevant industry (in this case, as it concerns trademark value). Then, based on these assessments, he arrives at a damages number. Under his multiplication-based approach, the Court understands Christensen to argue that, where one or more of these factors points to an outcome of zero (such as zero competitive overlap or zero trademark value), there are necessarily zero profits resulting from infringement.[3] By logical extension, the Court presumes that, in a scenario where all relevant numbers are greater than zero, Mr. Christensen's methodology *would* require actual arithmetic to arrive at a damages calculation.

The Court finds that Mr. Christensen's explanation of his methodology contains a glaring hole: namely, the critical step of how he arrives at the "zero" values he cites for his final "zero plus zero plus zero" (or "zero times one is zero") calculation that comprises his quantum of damages calculation. As he stated at various times in his report, Plaintiff and Defendant were competitors, even if to a limited degree. (ECF No. 26-1 at 7 (citing instance of head-to-head competition); 22 (citing "limited evidence" that parties compete); 6 (citing "limited overlap in the industry segments each company serves" and ineligibility for "some" contracts pursued by the other party).) Similarly, he acknowledged in his testimony that trademarks possess *some* value in the government contracting context. (ECF No. 26-2 at 159:19–20 ("it is possible for

---

[3]     The Court struggles to make sense of Mr. Christensen's explanation as to why he alters his methodology when the underlying facts change. That said, the Court need not solve all of the riddles in Mr. Christensen's approach to the quantum of damages to find that his methodology is fatally flawed, as the Court proceeds to discuss.

there to be some value"); 164:8–9 (confirming that the benefit of a trademark in the government contractor context is "not zero"). The Court notes that Christensen chose his words carefully on this subject: he emphasized several times in his report that trademarks provide "different" benefits to trademark holders in the government context, (*see, e.g.*, ECF No. 26-1 at 16), and that their utility is "limit[ed]," (*id.* at 7), but never asserts that they lack value completely. Yet when it came time to translate the (limited) degree of competition between the parties and the (limited) benefit of trademarks in the government contractor context into numbers for the purposes of calculating damages, Christensen arrived at "0" for each of these factors, per the "zero plus zero plus zero" explanation that he proffered in his testimony. A methodology that converts "some" into "none" requires some explanation. Yet here, too, Mr. Christensen provides the Court with a "zero" — zero explanation, that is.

The Court does not quibble with Mr. Christensen's assertion that an expert need not spill ink on mathematical calculations for a banal and obvious equation like "zero plus zero plus zero" or "zero times one". The lack of arithmetic on Mr. Christensen's quantum of damages calculation does not create the issue here. Rather, the glaring problem lies in Mr. Christensen converting values that are clearly *not* zero (concerning competition and trademark value) into the zeroes that underlie his ultimate calculation, without providing any clues as to how or why he performed that conversion.

The Court notes that its critique focuses on Mr. Christensen's methodology, not his results. Without wanting to engage in unnecessary hypotheticals, the Court can certainly imagine a scenario where the amount of competition and the value of a trademark were *so* limited that, after conducting reasonable arithmetic processes, an economist would arrive at an outcome of $0 quantum of damages. Yet Christensen provides no such processes and no such

explanation.  Rather, he offers a one-sentence conclusion much more akin to an *ipse dixit* opinion than a scientific calculation.  That is simply not enough under *Daubert*.

The Court finds Mr. Christensen's methodology as to calculating the quantum of damages insufficiently reliable for purposes of Rule 702.  The Court cannot agree with Defendant that a methodology that jumps from "some" to "none" without explanation is "sound," let alone that it satisfies the *Daubert* standard for reliability or scientific validity.  For these reasons, the Court EXCLUDES any testimony by Defendant's expert Mr. Christensen as to his opinions concerning the quantum of damages.

> ### b. Qualification to Opine on Value of Trademarks in Government Contractor Context

The Court next considers Plaintiff's challenge concerning Mr. Christensen's qualification to opine on the value of Plaintiff's trademarks.  In assessing such a challenge, this Court "ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999).  Imperfect fit between the expert's knowledge and experience and the issues at hand generally goes to the weight afforded to the expert's testimony, not its admissibility. *Radiance Found., Inc. v. Nat'l Ass'n for the Advancement of Colored People*, 27 F. Supp. 3d 671, 674 (E.D. Va. 2013) (citing *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1101 (10th Cir.1991)). However, where a purported expert "has neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered," the Court may bar that witness from testifying. *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989).  Put another way, this Court must conclude that an expert witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" for his testimony to be admissible. *Kumho Tire Co.*, 526 U.S. at 152.

Plaintiff argues that Mr. Christensen lacks the qualifications necessary to opine on trademark value for several reasons. Per Mr. Christensen's curriculum vitae and his deposition testimony, Plaintiff submits that Mr. Christensen possesses no specific education or training pertaining to trademarks, branding or government contracting, nor (save for a few minor exceptions) any professional experience involving these topics. According to Plaintiff, this combination of insufficient knowledge, experience and training in the "niche" field of trademarks within the government contracting context renders Mr. Christensen "not properly qualified to testify regarding the utility or value of trademarks in the government contracting industry," and therefore renders his proposed expert testimony inadmissible. (ECF No. 36 at 14.)

Defendant, in turn, contends that Mr. Christensen has "(far more than) the satisfactory knowledge necessary to opine" on all issues in his report, including trademark valuation. (ECF No. 41 at 8.) Rather than further substantiate this claim, Defendant instead asserts that, actually, "it matters not whether Christensen has experience in the specific, narrow area of trademarks or government contracting." (*Id.*) Instead, Defendant relies on this Court's decision in *Rutherford Controls Int'l Corp. v. Alarm Controls Corp.* for the proposition that a witness may be qualified to provide expert testimony despite possessing "little experience with a particular item," so long as the scope of that witness's education "embraces the subject in question in a logical or fundamental sense." (*Id.* (citing *Rutherford Controls Int'l Corp. v. Alarm Controls Corp.*, 2009 WL 5872896 (E.D. Va. Oct. 15, 2009) at *1).) Despite Defendant's failure to say more on this point, the Court interprets Defendant to argue that Mr. Christensen's broader education "embraces" the valuation of trademark valuation "in a logical or fundamental sense," and that therefore, he has the necessary qualifications to testify on this issue. Finally, to the extent that

Plaintiff's motion challenges the adequacy of Mr. Christensen's knowledge, Defendant points out that such a challenge goes to the weight of the testimony, not its admissibility. (*Id.*)

The Court finds no reason to doubt Mr. Christensen's expertise in economics generally, along with his self-asserted specialties of microeconomics, antitrust and calculation of damages. Mr. Christensen's report, curriculum vitae and deposition testimony all suggest extensive training and experience in these areas. Yet the Court struggles to find any support for Defendant's assertion that Christensen's "over 20 years of experience . . . and knowledge of economics," without more, enable him to assist the jury on specific questions concerning the value of Plaintiff's trademark. As Plaintiff highlights, Mr. Christensen by his own account could not recall taking a single course in trademarks, branding or government contracting. (ECF No. 36 at 12.) He also appears to possess little to no professional experience in matters involving trademarks or branding. (*Id.*) That includes no professional experience analyzing the value of trademarks specifically in the context of government contracting. (*Id.* at 13.) According to Mr. Christensen's report and his deposition, he has also never published any writings on questions of trademark, branding or government contracting issues, nor does he recall giving presentations on any of these topics. (ECF No. 36-1 at 26–33; ECF No. 36-2 at 73:17–74:3, 77:12–77:3.) As to government contracting, Mr. Christensen's experience remains limited to two long-ago assignments (of which he remembers little) and one recent matter involving under and overpayments by a state contractor, which the Court finds irrelevant to the expertise required here. (ECF No. 36-2 at 25:21–27:1; 45:1–13.) Nor does he appear to have served as a retained expert on government contracting at any time during his career. (*Id.* at 118:4–6.)

Instead, Christensen relied exclusively on the work of other authors to acquire the knowledge required of him. He acknowledged this fact in his deposition. (*Id.* at 119:13–120:6 (explaining that he studied other authors' work to understand what "does economics say about trademarks and then combine that with what the economics says about contracting").) A purported expert's ability to quickly read and digest information, and then apply that information to new facts, would render any competent law student an expert on virtually any issue. Such an interpretation would violate both the spirit and the text of Rule 702, which expressly requires "specialized knowledge" on the part of an expert, not just his sources.

While the Court lacks a representation by either party of what skills an expert must possess to competently perform valuations of trademarks in the government contractor context,[4] based on the parties' discussion of the government contracting industry and the processes involved, the Court finds that such valuations necessarily require significant understanding of industry-specific processes, including the many stages involved in selecting and vetting potential contractors. The Court therefore rejects Defendant's claim that specific experience in trademarks or government contracting "matters not" when it comes to assessing whether a purported expert will be able to assist a jury of laymen in understanding how such valuation processes work. (ECF No. 41 at 8.)

The Court easily distinguishes the present *Daubert* inquiry from the one that Defendant cites to in *Rutherford*. In that case, the court considered whether the purported expert possessed the necessary qualifications to opine on the mechanics of lock and latch design processes. In that

---

[4]     While Plaintiff refers to valuation of trademarks in the context of government contracting as a "niche" field, (ECF No. 36 at 14), and Defendant acknowledges that this is a "specific, narrow area," (ECF No. 41 at 8), neither of these characterizations speak helpfully to the skills that such a valuation requires.

case, the court found that, even if the expert's education on the specific technical issue was insufficient, he could be qualified "based on experience alone." *Rutherford,* 2009 WL 5872896 at *1. On the basis of the witness' specialized experience developing the locks at issue, the court deemed that he possessed a sufficient "basis for knowledge, skill, or experience" to aid the jury and qualify as an expert witness. *Id.*

In this case, by contrast, there exists a more significant disparity between Mr. Christensen's area of experience and the proposed area of testimony. Where the *Rutherford* expert had extensive experience with closely related mechanical engineering processes, the Court finds that Christensen's experience as an expert in antitrust and damages calculations bears no such relation to the processes inherent in trademark valuation. Where *Rutherford*'s expert lacked education but possessed experience regarding the specific issue, Mr. Christensen lacks both. The factual differences remain too great to lend the *Rutherford* court's ruling any weight in this matter.

The Court recognizes the Fourth Circuit's "strict" test for exclusion of an expert on the basis of qualification. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). However, based on the facts before it, the Court cannot find that Christensen possesses "satisfactory knowledge, skill, experience, training nor education" on the issue of trademark valuation. (*Id.*) His lack of training, education and experience concerning trademarks and trademark valuation stands apparent on the face of his biography and his curriculum vitae; his deposition testimony underscores this impression. Furthermore, as he admitted, Mr. Christensen's only knowledge on this topic stems from the publications that he consulted in preparation for his report. Given all of these factors, the Court cannot imagine that Mr. Christensen would satisfy the Supreme Court's

requirement that he provide "the same level of intellectual rigor" in the courtroom as "an expert in the relevant field" of trademark valuation. *Kumho Tire Co.*, 526 U.S. at 152.

For all these reasons, the Court finds that Mr. Christensen lacks the necessary qualification to testify as an expert on questions concerning the valuation of trademarks in the government contracting context. The Court therefore EXCLUDES any testimony by Mr. Christensen as to this issue.

### c.    Timeliness

Finally, the Court considers Plaintiff's challenge to Mr. Christensen's testimony on the basis of untimely disclosure. Under the Court's Scheduling and Pretrial Order, the deadline for the defending party to "identify all persons it expects to call as expert witnesses in opposition to any complaint" was September 16, 2024. (ECF No. 14 at 3.) The same deadline applied for service of "a copy of a written report … for each such expert witness." (*Id.*) Plaintiff submits that Defendant first notified Plaintiff of its intention to call Mr. Christensen as an expert on September 26, 2024, ten days after the Court's deadline. (ECF No. 36 at 8.) Defendant provided Mr. Christensen's report to Plaintiff that same day. (*Id.*) Plaintiff alleges that Defendant possessed "no valid justification" for its delay and that Plaintiff suffered harm as a result, since Plaintiff could not prepare and deliver expert rebuttal notice by the Court's September 26 deadline, and since Defendant's delay curtailed the available time for Plaintiff to depose Mr. Christensen and prepare the instant Motion. (*Id.* at 10, 7.)

Defendant does not contest the tardiness of its disclosure. Rather, it argues that no last-minute "surprise" or harm resulted from the delay, and that therefore, under Fourth Circuit precedent, this Court should not exclude the expert's testimony. To that end, Defendant invokes caselaw from both this Court and the Fourth Circuit to argue that Plaintiff's subsequent

20

deposition of Mr. Christensen sufficiently "remedied" any prejudice stemming from the delay. (ECF No. 41 at 10.)   Defendant also submits that it agrees to accept a delayed rebuttal report from Plaintiff without objection as to timeliness, and that the significant time remaining before trial obviates any "concerns" on Plaintiff's part concerning potential prejudice stemming from the delay.   (*Id.* at 10–11.)

As both parties acknowledge, the Court's Scheduling and Pretrial Order ("Scheduling Order") set forth a binding set of deadlines that the Court expects all parties to honor.   (ECF No. 14); *cf. Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375 (D. Md. 1999) ("[A] judge's scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.") (internal quotation omitted).   This Court has already admonished both parties for failing to comply in a timely matter with their obligations under the Scheduling Order, finding that both parties "have failed to make a good faith effort" in this regard.   (ECF No. 14 at 1.)   Nonetheless, Fed. R. Civ. Pr. 37(c)(1) provides an exception to exclusion where the failure to disclose is "substantially justified or . . . harmless."   Trial courts in this circuit regularly apply a five-factor test in assessing whether to apply this exception, in which they consider (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to disclose the evidence; and (5) the importance of the testimony. *S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).   The burden lies with the nondisclosing party. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).

The Court's analysis pursuant to these factors comes out in Defendant's favor. Defendant fails to offer any explanation for its failure to name Mr. Christensen in advance of the

Court's deadline, and Mr. Christensen's testimony is not likely to be very important at trial, given the Court's decision to exclude his opinions on quantum of damages and trademark value; these facts tilt in Plaintiff's favor on factors (4) and (5). However, based on the Court's review of the deposition transcript and the parties' briefing, it appears that Plaintiff was nonetheless able to submit a thorough, well-substantiated motion to exclude. Given Defendant's willingness to accept Plaintiff's delayed rebuttal report without objection, the Court finds that any potential prejudice from the delay has been sufficiently cured, weighing in favor of Defendant on factor (2). Given the Court's recent Order cancelling the trial dates in this matter (ECF No. 70), the Court also considers factors (1) and (3) to tilt in Defendant's favor. In the Court's assessment, these three factors outweigh factors (4) and (5), thus counseling a finding for Defendant.

Considering the relevant Fourth Circuit factors, and for all the reasons discussed above, the Court finds Defendant's failure to disclose the identity of its proposed expert and his report in a timely fashion harmless for the purposes of Rule 37(c)(1). The Court therefore DENIES Plaintiff's Motion to Exclude on the ground of untimeliness. Defendant's expert may testify as to his opinions that the Court has not excluded, namely his opinions as to whether, and to what extent, Plaintiff and Defendant compete, and his opinions concerning Plaintiff's expert's methodology.

### B.      Urbanchuk Motion

Plaintiff retained its proposed expert, Gregory J. Urbanchuk, to "quantify the monetary harm to Plaintiff resulting from Defendant's alleged action." (ECF No. 34-2 at 5.) In his report, Mr. Urbanchuk cites his "over twenty years of experience providing forensic, dispute and valuation consulting services" and his prior experience as an expert witness in litigation concerning "intellectual property, commercial damages, and valuation," as well as his prior

experience evaluating damages and testifying as part of litigation, including trademark cases. (*Id.*) In preparing his analysis here, Mr. Urbanchuk considered Defendant's historical profits from January 1, 2020, to March 31, 2024, and Defendant's prospective profits based on contracts that were "awarded but not completed as of March 31, 2024." (*Id.* at 6.) Mr. Urbanchuk explains the economic distinctions between damages and restitution and summarizes the relevant statutory language concerning monetary remedies in the Lanham Act. (*Id.* at 10–11.) He then proceeds to calculate Defendant's historical profits in two stages: first by subtracting interest income figures from total revenue figures, and then determining the relevant deductible costs based on Defendant's overall expenses and subtracting these relevant costs from the adjusted revenue figures that he previously calculated. (*Id.* at 12–14.) Due to a lack of relevant data from Defendant, Mr. Urbanchuk chose not to calculate prospective profits, but reserved the right to update his report accordingly. (*Id.* at 14–15.) In his opinion, historical profits resulting from Defendant's alleged infringement total $9,597,396 before apportionment. (*Id.* at 7.)

Defendant argues for exclusion, because Mr. Urbanchuk's testimony is "based only on common knowledge and will not assist the trier of fact." (ECF No. 34 at 5.) According to Defendant, Mr. Urbanchuk's opinions, and the calculations on which he bases these opinions, consist of "no more than simple arithmetic that falls within the common knowledge and experience of a jury." (*Id.*) As such, Mr. Urbanchuk's testimony ought to be barred for falling short of Rule 702's requirement that an expert's contributions "help the trier of fact." Fed. R. Evid. 702. In support of this argument, Defendant identifies what it believes are Mr. Urbanchuk's "mere[]" additions and subtractions, and cites several cases for the proposition that such "simple addition" of "basic calculations" is insufficient to satisfy Rule 702. (ECF No. 34 at 6–8.) Defendant also expresses concern that Mr. Urbanchuk's testimony on matters "within the

knowledge of lay jurors" creates a danger that the jury will give undue weight to his opinions, based on his "expert" status. (*Id.* at 11.) Finally, Defendant attacks Mr. Urbanchuk's report for several alleged shortcomings, including his failure to (a) consider "potential apportionment," (b) "discuss[] . . . Plaintiff's alleged losses" and (c) consider the Fourth Circuit's *Synergistic* factors, which "guide the process" of determining a damages award in infringement cases under the Lanham Act. (*Id.* at 9, 11); *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175–76 (4th Cir. 2006).[5]

Plaintiff refutes all of Defendant's objections. Without disputing the simplicity of Mr. Urbanchuk's arithmetic, Plaintiff draws attention to the work that Mr. Urbanchuk performed "in advance of and as a necessary precursor to" these calculations. (ECF No. 42 at 7.) According to Plaintiff, this work included utilizing his "valuation and accounting expertise" to "evaluate and interpret the data in MFS' financial statements," which in turn "informed" his subsequent calculations. (*Id.*) Plaintiff submits that it "belies logic" to believe that such work, which involves the evaluation and interpretation of financial statements, falls "into the common knowledge of a lay jury," and distinguishes Defendant's relevant cases on their respective facts. (*Id.* at 8 (internal quotation omitted).) Finally, Plaintiff addresses Defendant's arguments concerning Mr. Urbanchuk's alleged omissions. Plaintiff points out that, per the Lanham act, the burden to establish apportionment is squarely on Defendant, and that Mr. Urbanchuk had no duty to opine on this question. (*Id.* at 10 (citing 15 U.S.C. Sec. 1117(a)).) Plaintiff similarly dismisses Defendant's argument concerning Mr. Urbanchuk's failure to opine on Plaintiff's

---

[5]     While Defendant also cites cases concerning relevance, its Memorandum does not expressly challenge Mr. Urbanchuk's report on the basis of relevance. Therefore, this Court will limit its inquiry to Defendant's express challenge on the grounds of failure to be sufficiently helpful under Rule 702.

losses, pointing to the fact that Plaintiff "is not seeking" this avenue of monetary relief. (*Id.* at

10–11). Finally, Plaintiff rejects Defendant's claim concerning Mr. Urbanchuk's failure to

discuss the *Synergistic* factors, pointing to contrary case law, the jury's ability to "understand and

appreciate evidence" concerning the factors without expert testimony and the fact that Mr.

Urbanchuk "cites to and relies on the relevant section of the Lanham Act" concerning Plaintiff's

entitlement to recover. (*Id.* at 11.)

### 1.   Court's Analysis

Defendant's arguments fail to persuade the Court. Mr. Urbanchuk's proposed testimony

falls well outside a lay juror's knowledge and likely can help jurors assess a potential damages

award if Defendant is found liable. In addition, Defendant's cases are inapposite on the facts,

and its claims concerning Mr. Urbanchuk's alleged omissions are legally unsubstantiated and

mischaracterize the inquiry suggested by *Synergistic*. For all of these reasons, and as discussed

more fully below, the Court DENIES Defendant's Motion to Exclude.

The Court takes seriously its "gatekeeping responsibility" concerning the admission of

expert testimony. *Nease*, 848 F.3d at 229. At the same time, the Court reaffirms the "great deal

of discretion" it enjoys on this question, *Dorsey*, 45 F.3d at 814, and the Supreme Court's

reminder that "[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof," rather than exclusion, are the "traditional and appropriate

means" of attacking the opposing party's evidence. *Daubert*, 509 U.S. at 596.

As a threshold matter, the Court notes that Defendant does not challenge Mr.

Urbanchuk's qualifications to opine on the quantum of monetary harm, nor does Defendant

challenge "the validity of Mr. Urbanchuk's math nor the amounts provided" in his calculations.

(ECF No. 34 at 10.) Defendant's stated challenge focuses instead on Rule 702 and its

requirement that expert testimony "help" the jury to "understand the evidence or to determine a fact in issue." Fed. R. Civ. P. 702. As such, the Court focuses its inquiry narrowly on this question.

Upon review, the Court finds that Mr. Urbanchuk's proffered testimony falls well outside the "common knowledge" of a lay jury member. While the Court expects a lay juror to be capable of performing simple addition and subtraction, it does not expect jurors to know what figures from a company's financial statements may be relevant to the assessment of that company's profits and losses for the purposes of disgorgement in a trademark case, let alone what types of calculation to perform on those numbers in order to arrive at a relevant result. As noted above, Mr. Urbanchuk did not receive all of the data that he claims that he needed from Defendant; the Court can only imagine the added confusion faced by lay jurors assessing such incomplete information on their own. Mr. Urbanchuk brings his extensive experience calculating the quantum of monetary harm in trademark cases to bear on the numbers provided by Defendant. This experience allows him to arrive at a number that can help jurors assess what might be a proper damages number, should they find Defendant liable — and that Defendant may, of course, challenge by vigorously cross-examining Mr. Urbanchuk. For all of these reasons, Defendant's challenge on Rule 702 grounds concerning "common knowledge" fails.

The Court has reviewed Defendant's citations to case law where courts excluded experts on Rule 702 grounds and finds the facts of these cases easily distinguishable. The Court engages in a brief analysis of some of these cases; the distinctions that it draws below apply with equal force to the cases that it does not discuss.

In *TruAuto MC, LLC v. Textron Specialized Vehicles, Inc.*, 2021 WL 4167454 (D.S.C. Sept. 14, 2021), the court excluded a proposed expert whose sole contribution was multiplying

an hourly rate by the numbers of hours employees worked; both figures had been previously provided to him. The court excluded this opinion as "unhelpful" because it "did not require specialized knowledge." *Id.* at *2. While Mr. Urbanchuk's arithmetic is similarly banal, his expertise played directly into *selection* and *curation* of the figures that he used for his calculations. This essential preparatory work places his contributions well beyond the scope of what a lay juror could reasonably be expected to do. In *Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185 (4th Cir. 1990), the jury had to assess whether the amount of weight that a person was expected to lift was reasonable or unreasonable. The court held that the expert witness's calculations served to explain what the court considered a "commonly expressed" principle: that "it is more difficult to lift objects from a seated position" than from a standing position. *Id.* at 1188. By contrast, Mr. Urbanchuk's calculations concern a much more complicated question — the quantum of damages — that does not rely on a comparable "commonly expressed" principle that a jury would innately understand. Finally, in *Paired Pay, Inc. v. ClearObject, Inc.*, 2024 WL 1097471 (D.S.C. Feb. 1, 2024), the court found that the expert's opinions "consist of little more than adding invoices together to arrive at a damages figure." *Id.* at *1. As already discussed, the Court finds that Mr. Urbanchuk's work in evaluating and interpreting financial statements, and subsequently arriving at a damages figure by subtracting and adding amounts that he determined were appropriate for such calculations, meaningfully exceeds basic arithmetic like simply "adding invoices together."[6]

---

[6]   Defendant also cites *Schwartz v. Fortune Magazine*, 193 F.R.D. 144 (S.D.N.Y. 2000), but the trial court's cursory description of the underlying facts provides insufficient detail on the "basic calculations" it deemed "unhelpful" under Rule 702 for this case to help Defendant here. *Id.* at 147.

Finally, the Court considers Defendant's arguments as to Mr. Urbanchuk's alleged

omissions.  Defendant's discussion appears to raise objections based on relevance in a motion

that, on its face, challenges only whether Mr. Urbanchuk's opinions would sufficiently aid a lay

jury.  (*See* ECF No. 34 at 11 ("As such, Mr. Urbanchuk's report is *irrelevant* in assisting the trier

of fact...") (emphasis added).)  Even assuming *arguendo* that Defendant properly raised these

issues, the Court easily dispatches with them.  Defendant's implicit claim that Mr. Urbanchuk

had to assess apportionment errs as to the law; as Mr. Urbanchuk correctly points out in his

report, the statute clearly places the onus on *Defendant* to establish apportionment to the extent

appropriate.  (*See* ECF No. 34-2 at 15 (citing 15 U.S.C. Sec. 1117(a).)  As to Defendant's claim

that Mr. Urbanchuk failed to calculate and consider Plaintiff's losses, the Court agrees with

Plaintiff that these figures are irrelevant to Plaintiff's claims, since Plaintiff seeks disgorgement,

which is based solely on Defendant's earnings.  (*See id.* at 11 (Mr. Urbanchuk explaining his

approach to calculating monetary relief as "using a defendant's profits methodology").)

The Court is particularly troubled by Defendant's repeated invocation of the *Synergistic*

factors and Mr. Urbanchuk's purported failure to discuss them.  The *Synergistic* factors serve to

assist courts when assessing *whether* to award damages under the Lanham Act, and, in some

cases, whether enhanced damages are appropriate — not the *amount* of damages to award.  *See*

*Synergistic*, 470 F.3d at 175–76 (first factor is relevant to "an assessment of *whether* to make a

damages award;" application of second factor is important "with respect to the assessment of *any*

damages;" third factor assesses "whether another [kind of] remedy, such as an injunction" might

be more appropriate; a showing under the fourth factor "should weigh against an award of

damages;" if sixth factor is established, "such activity should weigh in favor of a damages

award.") (all emphasis added).)  That purpose is evident not just on the face of the Fourth

Circuit's opinion, but also in the way that trial courts have subsequently applied these factors.

*See, e.g., Choice Hotels Int'l, Inc. v. A Royal Touch Hosp., LLC (NC)*, 2019 WL 4781879 at *3

(W.D. Va. Sept. 30, 2019) (applying *Synergistic* factors and concluding that "an award of

damages is warranted" without drawing conclusions as to quantum); *Concordia Pharms., Inc. v.*

*Method Pharms., LLC*, 240 F. Supp. 3d 449, 457 (W.D. Va. 2017) (concluding, based on

*Synergistic* analysis, that the factors "weigh in favor of awarding enhanced damages."). The

*Synergistic* factors do not speak to Mr. Urbanchuk's assigned task of "quantify[ing] . . . monetary

harm" where liability is assumed "with respect to all of Plaintiff's claims." (ECF No. 34-2 at 5).

Consequently, Mr. Urbanchuk's failure to address the *Synergistic* factors does not bear on the

Court's present inquiry.

Since the Court holds that Mr. Urbanchuk's expertise falls outside the knowledge of lay

jurors, the Court need not consider Defendant's argument that jurors would give Mr.

Urbanchuk's opinions on matters within their common knowledge undue weight. (ECF No. 34

at 11.) To that end, the Court reminds Defendant that it will have a full opportunity to cross-

examine Mr. Urbanchuk and thereby help the jury assess how much weight that it should lend to

his testimony.

For all of the above reasons, the Court finds that Mr. Urbanchuk's proposed testimony

does not fall within the common knowledge of lay jurors, and therefore does not fall short of

Rule 702's requirement that expert testimony "help" the finder of fact. The Court rejects all

other related objections that Defendant raises in its Motion. The Court therefore DENIES

Defendant's Motion to Exclude the Testimony of Gregory J. Urbanchuk.

### IV.    CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART and DENIES IN PART

Plaintiff's *Daubert* motion (ECF No. 35).  Defendant's expert Kevin W. Christensen may testify

as to his opinions on whether, and to what extent, Plaintiff and Defendant compete with each

other, and his opinions concerning Plaintiff's expert's methodology.  He may not testify as to his

opinions concerning the quantum of damages and the valuation of trademarks in the context of

the government contracting industry.

The Court DENIES Defendant's *Daubert* motion (ECF No. 33).  Plaintiff's expert

Gregory J. Urbanchuk may opine on all matters discussed in his report at trial in this case.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____
David J. Novak
United States District Judge

Alexandria, Virginia
Dated:  <u>December 10, 2024</u>